## Mississippi State Board of ·Veterinary Examiners
### *v.* Sistrunk.

No. 39674          June 13, 1955          80 So. 2d 747

*Crisler, Crisler & Bowling,* Jackson, for appellant.

*Roy N. Lee, James W. Lee,* Forest, for appellee.

ROBERDS, P. J.

Sistrunk brought this proceeding to require the Mississippi State Board of Veterinary Examiners to issue to him a license to practice veterinary medicine, veterinary surgery and veterinary dentistry in the State of Mississippi. The chancellor, by final decree, ordered

the Board of Examiners to issue the license. From that decree the Board appeals.

The cause has already been before this Court. Board of Veterinary Examiners v. Sistrunk, 218 Miss. 342, 67 So. 2d 278. It was then heard upon demurrer based upon the contention that Sistrunk had a full, complete and adequate remedy at law, and that, therefore, equity proceeding would not lie. However, this Court, on the foregoing appeal, held the demurrer not well taken, and remanded the cause.

Section 8914-06 of 1954 Cumulative Supplement to Mississippi Code 1942, Annotated, after requiring all unlicensed persons to take an examination and obtain a license to practice veterinary medicine, veterinary surgery and veterinary dentistry, contains this proviso: "Provided, however, that any person who has practiced veterinary medicine, veterinary surgery and veterinary dentistry in this state for a period of ten years prior to the passage of this Act shall be granted a license upon his application therefor and upon satisfactory evidence furnished the board as to such practice, and of his good moral character, and payment to the board of a license fee of ten ($10.00) dollars." The quoted proviso was first enacted as a part of Chapter 371, Section 6, General Laws of Mississippi 1946. Sistrunk filed his application for a license under that provisor. He never had a license. He paid the required fee and it is admitted that he was at all times a man of good moral character. The only question is whether he is entitled to a license as one who, without a license, has practiced veterinary science under such circumstances as he is entitled to a license under the quoted provision. That is to be tested by the evidence which the Board had before it when it declined to issue the license at the June meeting 1951. That testimony consisted of (1) the application of Sistrunk filed at the June meeting, 1950 of the Board; (2) affidavits of twenty-three acquaintances of Sistrunk and citizens of the territory in which he had

practiced veterinary medicine, surgery and dentistry for many years prior to the filing of this application; (3) testimony given by Sistrunk at the June 1950 meeting, and (4) the report of the investigation by a special committee representing the Board. It is obvious we cannot detail all of this evidence. We will discuss the pertinent parts thereof.

The application of Sistrunk, attested by two persons and sworn to by Sistrunk before the chancery clerk, stated that he was then 54 years of age; that he resided two miles from Sebastopol in Leake County, Mississippi; that he had practiced veterinary medicine, surgery and dentistry in Mississippi from, and continuously since, 1920. Two persons certified to his good moral character.

The twenty-three affidavits were executed by persons who had known Sistrunk continuously from ten to thirty-five years prior to execution of the affidavits. They all attested to his excellent moral character and most of them mentioned the fact that for considerable time he had been a trustee of the Sebastopol Consolidated High School and a Deacon in the Salem Presbyterian church. They said he had practiced veterinary medicine, veterinary surgery and veterinary dentistry in Scott, Leake, Newton and Neshoba Counties for a period of twenty-five to thirty years previously; that he had continuously, during that period of time, administered to, treated and operated upon sick and afflicted domestic animals of various kinds, including mules, horses, cattle, dogs, etc., common to this country, and owned by affiants and others. All affiants were impressed with his efficiency and success in his line of work. A typical recital, in substance, is this: "* * * that, to their individual and personal knowledge, Mr. Sistrunk has practiced veterinary medicine, veterinary surgery and veterinary dentistry in Scott, Leake, Newton and Neshoba Counties, Mississippi, for a period of 30 years immediately prior to April 4, 1946; that during said period, Mr. Sistrunk has

continuously treated, operated on and prescribed for sick and afflicted animals for compensation; that Mr. Sistrunk is a Christian gentleman of excellent reputation, and he is of good moral character." These affidavits were made by people of various walks of life — farmers, cattlemen, municipal and county officials, bankers, and even licensed veterinarians, not only of Leake County, the home of the applicant, but of the other three counties above mentioned.

Sistrunk filed the present application at the June 1950 meeting of the Board. He attached the aforementioned affidavits to, and as a part of, his application. The Board did not then pass upon the application but, instead, appointed a special committee of two of its members to make a special investigation of the situation and report back to the Board. In August 1950 this special committee went into the community where Sistrunk and the other affiants lived and there made their own investigation. They personally interviewed some of those who had made the foregoing affidavits and also Sistrunk and inspected his equipment and library. They made a report to the Board, including their interviews with some of those who had executed the affidavits and with Sistrunk, which interviews were in the form of questions and answers taken down and transcribed by a stenographer who accompanied the committee. No oath was administered at these interviews.

The Board considered the report of these interviews at the June 1951 meeting, when the application was declined, along with the other testimony as herein shown.

Able counsel for the Board have noted a number of discrepancies between the assertions in the affidavits and the answers given by affiants in the interviews with the special committee. These discrepancies were, of course, before the Board. They consisted, in the main, in the statements of a number of the affiants that they had not personally seen Sistrunk operate on animals or pull or float or treat their teeth. Some said they had not

seen him give medicine. These detailed statements the Board naturally, and very properly, contrasted against the assertions of these persons in their affidavits that to their personal knowledge Sistrunk had practiced veterinary for a long time and that he had treated, operated upon and prescribed for sick and injured animals. It should be added, however, that many of those whose interview statements, strictly applied, contradicted parts of the affidavits, also said that they knew from reputation and what others had said that the assertions in the affidavits that Sistrunk had practiced veterinary, treated, administered medicine to and operated upon sick and injured animals for many years were true.

This special committee inspected the medical library and equipment of Mr. Sistrunk. Lists of the various books and medicines and instruments used by Sistrunk in his veterinary practice appear in the record. It is inferable that, while the medicines he had on hand, as far as they went, were properly a part of the medicines used by one qualified in veterinary science, yet the stock was far from complete to meet proper requirements. However, it also appears that Sistrunk, when he did not have on hand proper medicine for a particular case, would purchase suitable medicine for the particular sick or injured animal. It is apparent also that Sistrunk did not have on hand, and did not use, up-to-date instruments in performing some of his operations. Individual members of the Board, when Sistrunk was before it, put him through a rather grueling examination. He said he had practiced veterinary since World War I; that his practice was general; he named many diseases he had treated and explained how he treated them; that he received much veterinary training in the army; he had eight months lectures at Camp Beauregard when in the Field Artillery; that he had much practical experience in treating animals there — mostly mules; that he went overseas and received much veterinary training there. He was asked how he would treat hogs infected with cholera.

He said he administered vaccine according to the weight of the hogs; that he inserted the needle under the shoulder, "put it under the flabby part of the shoulder or the flank. I used a sterilized needle, but now I am going to be fair, I haven't vaccinated very few hogs. We haven't had any cholera." He was asked 'What kind of practice do you do, Mr. Sistrunk? A. I doctor cows, calves, mules and horses." Said he had not doctored any sheep. He explained he often called in a licensed veterinarian to help him in difficult cases or where operations were necessary. We deem it unnecessary to detail all of the examination of the applicant. It should be said that the members of the Board were entirely fair to Mr. Sistrunk — in fact, they displayed a sympathetic attitude towards him and the people occupying the territory he served. They might have correctly concluded that he did not possess that knowledge and skill in veterinary science essential to enable him to pass an examination under present day knowledge on the subject. Indeed, Sistrunk stated he did not think he could pass an examination. In fact, the Board proposed to him, through its special committee, that if he would withdraw his application for a license, he could continue his veterinary services and efforts without interference from the Board, explaining that it was not the function, or desire, of the Board to prosecute persons engaged in administering to the needs of sick animals even without a license. However, Sistrunk said he wanted to obtain a license under the quoted statute because he thought his customers would be better satisfied and that this would enable him to purchase all needful medicines.

Above, in listing the four classes of testimony which was considered by the Board, we mentioned under (4) the report of the special investigating committee. We do not go over that again, because we dealt with it in detailing the discrepancies between the affidavits and the personal response of affiants during the course of the interviews between them and the special committee.

Summed up, this applicant had engaged in practical veterinary for some twenty-five to thirty years; he had had much practical experience; he had served his people well. Indeed, all of the affiants, including licensed veterinarians, in their interviews with the special committee, were high in praise of the results brought about by applicant in his treatment of animals. Whether he was scientifically competent or not he was unusually successful from a practical standpoint.

We think he was the typical type of man the Legislature had in mind when it exempted from examination one who, for at least ten years previously, had engaged in the practice of veterinary medicine, veterinary surgery and veterinary dentistry. Mississippi State Board of Veterinary Examiners v. Watkins, 206 Miss. 330, 40 So. 2d 153. Unquestionable here the applicant had been so engaged.

■■ The Board says it had substantial evidence to sustain its conclusion and that in such case its findings will not be disturbed by this Court. That is the rule this Court had adopted. Miss. State Board of Veterinary Examiners v. Watkins, supra; and Board of Veterinary Examiners v. Sistrunk, 218 Miss. 342, 67 So. 2d 378.

■■ However, there are indications in the record that the members of the Board may have been confused as to just what was the controlling fact to be established. It is sensed from the record that the degree of skill and scientific knowledge and learning possessed by the applicant was the determining factor uppermost in the minds of the Board. They repeatedly gave expression to the laudable intent not to grant a license unless and until they knew the applicant possessed the necessary education, learning and skill to maintain a high standard of scientific knowledge of veterinary science. Tested by that criteria they did have much evidence to support their conclusion that Sistrunk was not entitled to a license. However, the determining test was whether Sistrunk had practiced veterinary medicine, veterinary surgery and

veterinary dentistry in such manner and to such extent as required by the statute for ten years prior to the filing of his application — not whether he possessed sufficient skill and learning on those subjects as to be able to pass an examination and thereby obtain a license. ██ █ It may be, of course, that in some case the proof may show that the acts performed and the treatments administered by one endeavoring to obtain a license based on practical experience fall so far short of the type of practice contemplated by the statute as to be a mere pretense or sham. The Board would have the right and be impressed with the duty to pass upon the nature and extent of the practice which the applicant had performed and determine whether the character, nature and extent of applicant's practical work in the field of veterinary science stamp him as one entitled to a license without taking an examination. ██ █ We need not in this case undertake to announce the standard and test by which to determine that question, for the reason that it is abundantly shown that this applicant, for thirty years, has held himself out as one competent to practice veterinary science, has had large experience in the treatment of various kinds of diseases among, and injuries to, all types of domestic animals in his section of the country, administering medicine to and operating upon them, charging for his services, and that his work and services in this field have been unusually successful on their merits and satisfactory to his clients. This brings him within the meaning of the statute entitling one to a license without an examination. The chancellor so found and concluded. The evidence amply supports the finding and conclusion.

Affirmed.

*Holmes, Arrington, Ethridge* and *Gillespie. JJ.,* concur.